Sean L. Hartfield, OSB 020591
PO Box 11266
Portland, OR 97211
503-701-1124
sean@hartfieldlaw.com
Attorney for Plaintiff (Pro Se)


IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


| | |
|---|---|
| SEAN L. HARTFIELD, | Case No. 3:16-cv-00068 |
| Plaintiff. | COMPLAINT: |
| | 14th Amendment - Equal Protection: |
| | (Race & Class-of-One) |
| vs. | Oregon Law |
| | (Fraud) |
| OREGON STATE BAR, and | |
| Unknown Individuals (J. Doe Nos. 1    10) | **Jury Trial Requested** |
| Defendants. | |


## I.  INTRODUCTION

1.      Plaintiff Sean L. Hartfield ( Hartfield ) alleges that defendant Oregon State Bar (the

 bar ) and J. Doe No. 1 through J. Doe No. 10, violated plaintiff s rights protected under the

Equal Protection Clause of the 14th Amendment to the United States Constitution by subjecting

Hartfield to an illegal, arbitrary and irrational application of the bar s regulatory authority.

2.      Hartfield further alleges that the bar violated Oregon law by falsely presenting itself as

working primarily for the benefit of the public when in fact its primary goals include the

financial benefit of the bar, the financial and professional benefit of selected members, and the

illegal use of the bar s regulatory authority to engage in arbitrary, irrational and selective prosecutions.

## II.  JURISDICTION

3.      This action is brought pursuant to 42 USC §§ 1983 and 1988, and the Fourteenth Amendment to the United States Constitution, with the jurisdiction of this Court predicated on 28 USC §§ 1331, 1343, and 1367.

## III.  PARTIES

4.      Hartfield is an African American and was at all material times relevant to this Complaint a citizen of the United Stated, a resident of Portland, Oregon, and a member of the bar.

5.      The bar is, and was at all material times relevant to this Complaint, a public corporation.

6.      At all material times relevant to the allegations of this complaint, individual defendants J. Doe No. 1 through J. Doe No. 10 were agents, employees, officials, staff, and/or representatives of the bar.  Each J. Doe defendant is sued in his/her respective individual capacity.

## IV.  COMMON FACTS

7.      The bar was established to license and discipline lawyers, to regulate the practice of law, to provide a variety of services to bar members and the public, and to provide specialized professional services to the Supreme Court of the State of Oregon.

8.      The bar asserts that it functions to provide  protection to the public,  that it  works to eliminate bias in the justice system and to ensure access to justice for all,  and that it is
 committed to serving and valuing its diverse community, to advancing equality in the justice system, and to removing barriers to that system.

9.      As a condition of practicing law in the state of Oregon, lawyers must be members of the bar and pay dues/fees to the bar.

10.    The treasury of the state of Oregon is not legally pledged to satisfy the bar s financial obligations, and the bar has the power to take property in its own name.

11.    Ostensibly to  assist the public in finding the right lawyer,  the bar operates a Lawyer Referral Service (LRS).   The bar does not disclose to the public that the bar receives a 12% kick-back on each LRS-referred matter in which the lawyer earns and collects attorneys  fees.

12.    Because of its financial interest in referring the public to LRS members who pay a kick-back to the bar, the bar s LRS does not maintain a list of pro bono lawyers or organizations that might otherwise assist poor or low income members of the public for free or at a rate that does not include a kick-back to the bar.

13.    In 2002, Hartfield became a licensed member of the bar and began practicing law from his office in northeast Portland on Martin Luther King Jr. Blvd.  Hartfield has maintained a membership in the bar since 2002.

14.    Between 2000 and 2005, when the majority of Oregon s elderly, working class African American homeowners resided in north and northeast Portland, economic development in the area led to rapid and substantial increases in their real property values.  These homeowners, often with limited educations, were increasingly targeted by con artists presenting to them in various forms such as  friends  or family, home improvement contractors, and trusted professionals such as attorneys, accountants, and real estate agents, all seeking to take financial advantage of them.

15.    Though most elderly, African American homeowners in north and northeast Portland were of low income or moderate means, Hartfield s law practice began taking on more and more of their cases as elder abuse spread throughout the community, particularly in the form of residential deed and/or home equity theft.  Further, their limited incomes rarely allowed them to pay litigation expenses and/or a retainer for the legal services.

16.     In 2003, Mrs. Myrtle Nickerson ( Mrs. Nickerson ) hired Hartfield regarding the administration of her sister Ella Mae Webster s estate in the Multnomah County Probate Department.  Mrs. Nickerson was one of eight heirs to the Webster estate, and the remaining seven heirs were residents of the state of Texas.  One of the other seven heirs was represented by a guardian, and one of the heirs died in the course of the administration of the Webster estate. The Webster estate included, in part, income from several oil and gas leases in the state of Texas, assets in investment accounts, and assets previously managed by a conservator.  Around September 2004, after the inventory and final accounting were submitted, the probate court approved the payment of attorney fees to Hartfield s law office, as well as monies for costs and expenses which had been advanced by the firm.  Hartfield had waived more than half of the legal fees recoverable in that matter.

17.     Following the closing of the Webster estate, Mrs. Nickerson and Hartfield continued to communicate socially because they lived in the same community and because Mrs. Nickerson would sometimes stop by Hartfield s office when she walked to do errands.

18.     In the fall of 2004, Mrs. Nickerson advised Hartfield that a contractor had refused to complete work on the Nickerson home after her husband, Nathan Nickerson, had fully paid the contractor with a check which had been promptly cashed by the contractor.  Hartfield communicated with the contractor and recovered all monies the contractor had taken from the Nickersons.  Hartfield did not charge the Nickersons for any services Hartfield provided in that matter.

19.     Later in the fall of 2004, Mrs. Nickerson advised Hartfield that Nathan Nickerson was writing checks to people under unusual circumstances and that she was concerned that people might be taking advantage of him because of what appeared to Mrs. Nickerson to be changes in

his demeanor, personality, and in his ability to care for himself.  Hartfield advised Mrs.

Nickerson of her options, of related problems she might encounter, and of immediate proactive

measures she could take if she believed Nathan Nickerson was experiencing a diminished mental

capacity.   Ultimately, Hartfield accompanied Mrs. Nickerson and Nathan Nickerson to their

banks and worked with the respective banking representatives to place safeguards on their

accounts.  Hartfield did not charge the Nickersons for any services Hartfield provided in that

matter.

20.     Around that same period, Hartfield was contacted by the Nickerson s financial consultant

who urgently requested that a power-of-attorney from Nathan Nickerson to Mrs. Nickerson be

obtained so that Mrs. Nickerson could authorize the financial consultant to take certain actions

regarding the Nickerson s annuity investments.

21.     After several meetings with the Nickersons over the following weeks, Hartfield

determined that it would not be appropriate for Nathan Nickerson to execute a power-of-attorney

based on what appeared to be Nathan Nickerson s diminished mental capacity.  Hartfield advised

Mrs. Nickerson that a conservatorship would provide her with the authority to act on Nathan

Nickerson s behalf regarding the annuity investments.  Hartfield informed Mrs. Nickerson of the

amount of the court fees for the conservatorship and he advised Mrs. Nickerson that because the

conservatorship for Nathan Nickerson would be relatively simple as compared to the Webster

matter, Hartfield would not charge Mrs. Nickerson for any services Hartfield provided on her

behalf for the conservatorship for Nathan Nickerson.

22.     Mrs. Nickerson later advised Hartfield that Nathan Nickerson s mental state appeared to

be deteriorating and that she had grown concerned for their safety.  At Mrs. Nickerson s request,

Hartfield began assisting her with research of assisted living facilities that could care for Nathan

Nickerson.  Hartfield and Mrs. Nickerson learned that for the type services Mrs. Nickerson

believed would be best under the circumstances, the expense would be several thousand dollars

per month.  After Hartfield researched potential resources such as Medicare/Medicaid and

advised Mrs. Nickerson that she might be required to spend much of their savings before

whatever Medicare/Medicaid services might be available, Mrs. Nickerson grew became alarmed

that the thousands in monthly expenses for Nathan Nickerson s care could quickly deplete their

savings.   Further, despite Hartfield s assurances otherwise, Mrs. Nickerson remained fearful that

she might somehow lose her home.  Because of Hartfield s limited experience in the area,

Hartfield advised Mrs. Nickerson that she would need to speak to someone other than Hartfield

to get advice about what would actually be required of her to qualify for resources such as

Medicare/Medicaid.  Hartfield charged no fee to the Nickersons for his services related to these

matters.

23.    Around mid-February 2005, Nathan Nickerson was admitted to an assisted living facility

at an expense of approximately $3,250.00 per month.

24.    Because Hartfield was aware of Mrs. Nickerson s financial concerns related to the

thousands being spent for Nathan Nickerson s care, Hartfield advanced the $504.00 court filing

fee on Mrs. Nickerson s behalf when she was hesitant to provide the funds.

25.    In the course of representing Mrs. Nickerson as conservator for Nathan Nickerson,

Hartfield grew concerned when he and Mrs. Nickerson were unable to obtain records from the

Nickersons  financial planner in support of amounts the financial planner said was held in

various annuity accounts.  Because Mrs. Nickerson was unfamiliar with the account balances and

could not locate any prior related balance sheets, and because Nathan Nickerson was

incapacitated and could not verify whether the balances were consistent with his understanding

of the accounts, Hartfield insisted on something more than what appeared to be a statement compiled by the financial planner who had managed the accounts.  Though Mrs. Nickerson appeared to trust the financial planner, Hartfield explained to Mrs. Nickerson that she and Hartfield had a duty to verify the amounts provided by the financial planner before presenting those amounts to the court as accurate.

26.    Ultimately, Hartfield was unable to obtain complete financial records to support the amounts provided by the Nickersons  financial planner, and Hartfield remained concerned that there were likely additional funds which were subject to the conservatorship.  Thus, though Hartfield knew that an inventory and final accounting were due in the matter, Hartfield concluded that it would be improper to file a final accounting which would only include the amounts provided by the Nickersons  financial planner, particularly where Hartfield and Mrs. Nickerson would effectively be attesting to the accuracy of the amounts submitted to the court.

27.    The probate court record reflects that on or about February 7, 2007, Judge Tennyson issued to Hartfield and to Mrs. Nickerson an Order [to appear on March 7, 2007] to Show Cause as to   why he or she should not be removed as said officer and/or found in contempt  for failure to file an inventory, and warning that   FAILURE TO APPEAR OR CORRECT DEFICIENCY MAY RESULT IN THE REMOVAL OF THE FIDUCIARY OR SUCH OTHER ACTIONS AS THE COURT MAY DEEM PROPER.

28.    When Mrs. Nickerson was alarmed at having received a copy of the February 7, 2007 court order referenced above, Hartfield advised Mrs. Nickerson that the only way to fix the matter was to file an inventory and final accounting, that Hartfield would only facilitate the filing of the inventory and final accounting if his concerns regarding their accuracy were addressed, and that Mrs. Nickerson would be removed as conservator if no inventory and final accounting

were filed.  Mrs. Nickerson was further advised that a subsequent conservator would likely file the inventory based on the statement provided by the Nickersons financial planner and nothing more.

29.    Nathan Nickerson died on February 25, 2007.

30.    When neither Hartfield nor Mrs. Nickerson appeared on March, 7, 2007, someone from the probate court left a message for Hartfield instructing him to appear in court the following day.  Hartfield appeared the next day and advised Judge Tennyson (in chambers) that Nathan Nickerson had died the prior week.  Judge Tennyson then instructed Hartfield to provide a final accounting which provided what assets there were, what actions Mrs. Nickerson had taken, and what was necessary to transfer the conservatorship over to the estate that might be opened on Nathan Nickerson s behalf.  The March 7, 2007 hearing date was continued (rescheduled) to April 3, 2007.

31.    Hartfield informed Mrs. Nickerson of Judge Tennyson s instructions regarding assets that might transfer to an estate that might be opened on Nathan Nickerson s behalf.

32.    Judge Tennyson later testified that it was her understanding that at some point Hartfield contacted some unidentified person at the probate court and requested that the March 7, 2007 hearing date which was continued to April 3, 2007, again be rescheduled.  Judge Tennyson further testified that it was her understanding that Hartfield s request was approved and that the unidentified person at the probate court instructed Hartfield to file with the court a letter stating that the hearing was to be rescheduled to April 30, 2007.

33.    Hartfield acknowledged that he called the probate court while traveling to request a rescheduling of the April 3, 2007, hearing date.  Hartfield denied remembering any instruction to submit a letter stating that the hearing was to be rescheduled to April 30, 2007, and noted that

such a procedure sounded  very odd  to him.  Regardless, at no point was there ever a court

order setting an April 30, 2007 hearing date for the Show Cause Order previously scheduled for

March 7, 2007.

34.     Judge Tennyson testified that when Hartfield did not appear on April 30, 2007, she

removed Mrs. Nickerson as conservator on or about May 1, 2007, and issued to Hartfield an

Order [to appear on May 8, 2007] to Show Cause for Contempt of Court <u>for failure to appear as</u>

<u>directed</u> on April 30, 2007.  The order was purportedly mailed to Hartfield on May 1, 2007, but

Hartfield did not learn of the order until some time after May 8, 2007.  Thus, Hartfield did not

appear in the probate court on May 8, 2007.

35.     On or about June 29, 2007, Judge Tennyson sent to the bar a letter complaint in which

she stated that Hartfield s conduct in the course of representing Mrs. Nickerson appeared to be

 neglect of a legal matter.

36.     Hartfield cooperated with the bar throughout the course of its investigation resulting from

Judge Tennyson s complaint.  Hartfield s cooperation with the bar included corresponding with

the bar s disciplinary attorney via various phone calls and written correspondences.  Further,

Hartfield encouraged the bar to speak with Mrs. Nickerson as soon as possible because Hartfield

believed Mrs. Nickerson would be forthright and honest in her responses regarding her

interactions with Hartfield during the course of his representation of her over the prior five years,

including circumstances surrounding her role as conservator for Nathan Nickerson.

37.     After removing Mrs. Nickerson as conservator, Judge Tennyson appointed Ron D. Bailey

of the law office of Duffy Kekel LLP as the attorney and successor conservator to replace Mrs.

Nickerson as conservator.  Mr. Bailey notes that he subsequently conferred with Mrs. Nickerson,

her financial advisor, and Mrs. Nickerson s son Ralph Nickerson.  Mr. Bailey filed an inventory

and final accounting which was consistent with the amounts previously provided to Hartfield by the Nickersons  financial planner.

38.    In a letter dated September 7, 2007, written to Mr. Bailey and filed with the court on or about September 12, 2007, Ralph Nickerson objected to Mr. Bailey s attorney fee statement and the final accounting, stating:

> *With all due respect to you the court appointed legal representative of the above referenced case and pursuant to your overture to client Myrtle Nickerson 83 years of age and not sophisticated in such matters, at the advice of her son and power of attorney ask that you immediately notify the court that we object to the proceedings of the First and Final Account and Petition for Order Approving Account and Distributing Conservatorship Assets of Nathan Nickerson.  That on the grounds of a suspicion of misrepresentation, both now and before, as well as any other legal matters that may be uncovered as unfavorable to the best interest of his estate, Myrtle Nickerson does hereby assert her intention to contest, and to pursue with all due diligence a satisfactory reconciliation of the proceedings of the subject conservatorship before her signature of approval is rendered.*

Ralph Nickerson signed the letter as  Power of Attorney for Myrtle Nickerson.

39.    Hartfield was surprised to learn that Ralph Nickerson was Mrs. Nickerson s power of attorney because over the years that Hartfield had known her, Mrs. Nickerson had previously only allowed her daughter to attend meetings with Hartfield and to otherwise obtain any information regarding the Nickersons  legal, financial, and/or personal matters.

40.    Having filed the objection on his mother s behalf, and despite the fact that he was not a licensed attorney, Ralph Nickerson was then allowed to appear at the hearing and cross-examine

witnesses.  At the onset of the hearing, Judge Tennyson stated that  today at issue I think is the

objection filed by Mr. [Ralph] Nickerson sort of on behalf of Mrs. Nickerson related to the final

account really having to do with the fees and costs[.]    In the course of the hearing, Judge

Tennyson stated to Ralph Nickerson

> Frankly, I will tell you the court s perspective is that Mr. Bailey did your family
>
> and the court a favor by stepping in when Mr. Hartfield didn t do his job.  And
>
> your family may have a claim against Mr. Hartfield, or through the professional
>
> liability fund, for his failing to follow through on a case.  Whether you re doing it
>
> for no fee or whether you re doing it for a fee, you owe your client exactly the
>
> same duty of representation and Mr. Hartfield failed the court, quite clearly,
>
> because I removed him and your mother, from this case.  But, he also failed your
>
> family.  So there may be a claim there.  But this is not something I can resolve
>
> today and I certainly can t give ya ll any legal advice about how to handle that.
>
> But in terms of Mr. Bailey attempting to come in and sort of recreate what had
>
> done on, his duty to the court is to do the best accounting that he can, based on the
>
> information that s available to him and then file what he can file in order to try to
>
> get the case resolved and to get this case dismissed because it doesn t need to be
>
> open anymore.  That s really the bottom line here.

41.    Further, after informing Ralph Nickerson that  all the notices that we sent out, except for

the final one where we cited Mr. Hartfield in court for contempt, your mom got a notice that said

[Mrs. Nickerson must also] appear,  Judge Tennyson added:  I ve said it to you once already

this morning and I ll say it to you again: I think the Professional Liability Fund is your next stop

in terms of getting some recompense for the fees that are going to be paid, because the court

needs to wrap this up.   Judge Tennyson then stated that   what s going to happen is that I would order the fees to be paid and then you would take your claim to the Professional Liability Fund and it would be refunded to you at that point.

42.    Ralph Nickerson, apparently under the belief that Mrs. Nickerson had a right to a free attorney regardless of her own actions as conservator, subsequently filed a claim against Hartfield s professional liability fund.  The insurance claim was denied.

43.    At the close of Ralph Nickerson s representation of his mother at the hearing, Judge Tennyson ordered that some clerical errors be corrected in the final accounting and granted the original $2,530.00 in fees and costs as originally requested by Mr. Bailey.  Further, because Mr. Bailey would also be awarded additional fees and costs related to responding to the objection filed by Ralph Nickerson, the total fees and costs ultimately awarded to the Mr. Bailey was $4,917.50.

44.    Based in part on Hartfield s race, the bar arbitrarily and irrationally failed and refused to offer diversion to Hartfield despite Hartfield s eligibility for the program pursuant to Rule 2.10 of the bar s Rules of Procedure (Revised 3/20/2008).  Instead, on or about April 23, 2008, the bar filed a formal complaint against Hartfield in the Supreme Court of the State of Oregon alleging violations of the Rules of Professional Conduct including neglect of a legal matter, failure to withdraw from representation when required to do so, and conduct prejudicial to the administration of justice.

45.    Mrs. Myrtle Nickerson died on September 25, 2008.

46.    In Hartfield s deposition on February 19, 2009, and at Hartfield s subsequent trial resulting from the bar s complaint to the Oregon Supreme Court, Hartfield acknowledged knowing that an inventory and final accounting needed to be filed in the matter.  However,

Hartfield stated his belief at the time was that the better course to take under the totality of the

circumstances was 1) to avoid making any explanatory statements to the court because such

statements were potentially harmful to his client Mrs. Myrtle Nickerson; and 2) to avoid

knowingly filing an incomplete and/or fraudulent inventory and final accounting.

47.    The Nickersons son, Ralph Nickerson, appeared at Hartfield s trial and confirmed that

there were additional, undisclosed joint funds in amounts even greater than Hartfield believed

existed.

48.    Over the five-year period that Hartfield represented Mrs. Nickerson in various matters,

Mrs. Nickerson never complained to any court or to the bar regarding Hartfield s conduct or

services provided.

49.    In part based on Hartfield s race, the bar assumed and argued that Hartfield must have

had ulterior motives for refusing to file the inventory and final accounting, and requested that

Hartfield be suspended from the practice of law for 90 days.  The bar s request for a 90

suspension was illegal, arbitrary and irrational as compared to discipline applied to its other

members.

50.    The trial panel concluded that Hartfield  was not justified in failing to comply with the

court s orders and to simply allow the conservatorship to languish pending his and his client s

dismissal [and that by doing so] Hartfield did prejudice the administration of justice by delaying

the court for many months in processing the conservatorship.   The trial panel dismissed all other

charges and gave Hartfield a public reprimand for violation of § 8.4(a)(4) of the Oregon Rules of

Professional Conduct which prohibits  conduct that is prejudicial to the administration of

justice.

51.     Hartfield appealed the trial court s decision to the Oregon Supreme Court which upheld the trial panel s decision.

52.     As a result of the bar s illegal, arbitrary and irrational application of its regulatory authority toward Hartfield, the bar obtained a $4,200.20 judgment for costs against Hartfield and placed a lien on Hartfield s home.  Interest on the judgment accrued at 9% per annum from January 3, 2011 until Hartfield was able to pay it off in December 2015.  Hartfield never recovered the $504.00 that was advanced to Mrs. Nickerson for court fees.

53.     As a further result of the bar s illegal, arbitrary and irrational application of its regulatory authority toward Hartfield, Hartfield suffered damage to his reputation, goodwill and respect in the community, damage to the legal community s respect and confidence in Hartfield, emotional distress, angst, and humiliation.  For the purpose of exacerbating the humiliation and embarrassment Hartfield experienced, the bar published a public reprimand in the December 2010 issue of the Oregon State Bar Bulletin.  The published statement is incorporated herein by reference as **Exhibit 1**.

54.     In part based on Hartfield s race, and as recently as 2014, the bar has continued to subject Hartfield to an illegal, arbitrary and irrational application of its regulatory authority, treating Hartfield less favorably than the bar s other members.

55.     Defendants J. Doe No. 1 through J. Doe No. 10, through their individual actions, collectively and with deliberate indifference, while acting with authority granted to them by the bar, allowed and/or caused the bar s violation of Hartfield s rights as alleged herein.

### V.  FIRST CLAIM FOR RELIEF

### Equal Protection Clause of the 14th Amendment

56.     Plaintiff re-alleges paragraphs 1 through 55 above.

57.    Defendants  prosecution of Hartfield was not the result of any legitimate regulatory action, but rather was the result of racial animus and spite.

58.    As a result of defendants  violations of Hartfield s rights as alleged herein, Hartfield suffered economic and non-economic damages in amounts to be determined at trial.

59.    Pursuant to 42 U.S.C. §§ 1983 and 1988, plaintiff should be awarded his attorney fees, costs and expenses.

## VI.  SECOND CLAIM FOR RELIEF

Oregon Law:  Fraud

60.    Plaintiff re-alleges paragraphs 1 through 55 above.

61.    The bar s material assertions and representations that it functions to provide  protection to the public,  that it  works to eliminate bias in the justice system and to ensure access to justice for all,  and that it is  committed to serving and valuing its diverse community, to advancing equality in the justice system, and to removing barriers to that system  were knowingly false, and defendants knew the bar s assertions were false at all material time.

62.    The bar made the material and false assertions and representations as alleged herein with intent that they be acted on by Hartfield and others, and to encourage continued membership in the bar and the payment of dues and fees to the bar.

63.    At all material time, Hartfield was ignorant of the falsity of the bar s material and false assertions and representations as alleged herein.

64.    Hartfield had a right to and did rely on the bar s material and false assertions and representations throughout the course of his law practice, continued his membership in the bar, and paid dues and fees to the bar, all while believing the bar primary goals included providing protection to the public, eliminating bias and ensuring access to justice for all, serving and

valuing our diverse community, advancing equality in the justice system, and removing barriers to that system.  Further, Hartfield made personal sacrifices to aid the bar and the public in reaching those primary goals, only to learn that his sacrifices were wasted because some of Hartfield s clients, particularly African Americans, were ultimately disserved by Oregon s legal system as a result of the bar s actual goals, policies and practices.

65.    Hartfield s damages and injuries as alleged herein were caused by the bar s material and false assertions and representations as alleged herein, and defendants  conduct as alleged herein.

66.    As a result of defendants  fraud as alleged herein, Hartfield suffered economic and non-economic damages in amounts to be determined at trial.

## VII.  JURY TRIAL REQUESTED

67.    Hartfield hereby requests a jury trial.

**Wherefore, plaintiff prays for relief from the Court as follows:**

1.    Accept jurisdiction over plaintiff s federal and state claims;

2.    Award non-economic and economic damages against defendants in amounts to be determined at trial;

3.    Award litigation costs/expenses pursuant to 42 USC §§ 1983 and 1988 where applicable; and

4.    Grant Hartfield such other relief as the Court deems just and proper.

Dated this January 14, 2016.

Respectfully submitted,

/s/ Sean L. Hartfield
Sean Hartfield
Attorney for Plaintiff (Pro Se)